Morning. My name is Eric Seitz. With me is my associate, Ronald Kim, and we thank you for the opportunity to appear here on behalf of Gary Rodrigues. I would like to, if I may please, reserve two minutes for my rebuttal. Our argument this morning is going to be relatively simple and straightforward. In Skilling v. United States, which was decided by the Supreme Court in 2010, a unanimous Supreme Court found that the honest services theory, which the government employed here in many counts, is vague. Over dissents, the majority approved, however, a limited continued use of that theory, so long as it is made explicit that either bribery or kickbacks occurred and that there be an instruction and a finding by the jury with that element. In the present case, admittedly, there was no bribery and there was no kickback instruction and there was no finding by the jury that kickbacks had occurred. So the government now argues, and Judge Ezra found in this proceeding below, that even in the absence of what the Supreme Court mandated, that the error was harmless because there was ample evidence of kickbacks or an equivalent and that, if properly instructed, that the jury likely would have made the necessary findings. In our view, that's entirely speculative and it is the essence of vagueness. We have cited to you three cases, and I apologize for that being done so belatedly, in which post-Skilling courts, including a panel of this Court, has found that precisely for the reasons that underlay the Skilling ruling, that convictions on the honest services theory could not stand. The Jaramillo case, which was decided by a panel of this Court in February 2011, in a memorandum opinion, the Wright case, which was a bribery case, but nevertheless I think the argument of that case is applicable, which was decided by the Third Circuit last month, and most recently the Hornsby case, which is a Fourth Circuit case, which in our view is virtually the same as this particular case. In that case... And why were these cases cited so belatedly? Well, first of all, two of them were just decided last month and we only learned about them as we began to prepare for this argument. I apologize for that, but that was the earliest that we became aware of those two cases. The Jaramillo case was a memorandum opinion and we had some concerns about citing that earlier, but we also basically just made a determination under the rule that that was citable as well. So I apologize to the Court for the belated notice of that, but that was under the circumstances. Unfortunately, what happened? Well, the Hornsby case has a test that might be relevant. In other words, the Hornsby opinion says, we cannot say with fair assurance that the jury convicted Hornsby on this basis alone. That seems to me to be close to the right question. It's not whether a jury properly instructed could have or would have convicted somebody of kickbacks, but we under the harmless error test I think have to look at this case and conclude as they did in Hornsby that the jury did convict this person, Rodriguez, on a kickback basis. Would you agree with that? I would agree with that, but then I'd also look at the facts of the Hornsby case. There was a $10,000 gift. There were no consultant's fees that were disguised. So I think that's different. Well, I disagree with you in two aspects. First of all, in Hornsby there was a commission that was paid to Hornsby's girlfriend, $20,000, for arranging supposedly these contracts, even though it wasn't in her area, geographic area where these contracts were negotiated. And she then in turn gave $10,000 of her $20,000 commission back to Mr. Hornsby. So he actually received money as a consequence of this, which the Fourth Circuit determined could just as easily, the conviction could just as easily have been based purely upon a concern of conflict of interest. So how do we look at this record and conclude one way or another that the jury did or didn't convict Hornsby on the kickback basis? Well, in our record, I don't think you can make that determination. And that's because the commissions at issue, first of all, there was a lot of murkiness in this case, which I think is of concern and it's a background. The murkiness stems from the fact that the commissions in this case did not belong to the union for which Mr. Rodriguez worked. The money came from the members who enlisted in these benefit plans. The union did not have a stake in that at all. These were union-arranged group health plans. So the money belonged to the members, if at all. Secondly, the commissions... That seems to be an awfully thin, it's a difference, but I'm not sure it's a distinction, but go ahead. The only aspect of that, and the only reason I raise that, is because in terms of whose money this was and who was owed something with regard to those services, there was some lack of clarity with respect to that. I don't think there was any lack of clarity at all. We know exactly what happened. Well, I'm not sure... And where the money came from and the relationship of the members of the union to the union and his relationship to the union. I mean, that seems to be... The only murkiness, I think, there is because you're saying it's murky and I don't think it is. The question is what does it amount to, not whether it's murky. Well, again, my argument here is that I'm not clear here in this, and I don't think this Court can be clear or that Judge Ezra could have been so clear, even though he sat through the trial, that a jury would have determined as to these counts that there were kickbacks that took place. See, I don't think it's would have determined. I think it's did. I think Hornsby is right. We have to look at this case and conclude, maybe beyond a reasonable doubt, that there was no substantial or injurious effect or influence from this error, because this is unlike some of the other errors we look at. This is an element of the offense, and I think the only way we can decide that it was harmless is to conclude that the jury did, in fact, convict this person based on a kickback theory, and I think we may have to conclude that beyond a reasonable doubt, and I'm saying that, among other things, to telegraph information to the other side, that if I'm wrong on that, they better be prepared to tell me I'm wrong. I think the standard review, in other words, is very demanding in a case like this. I concur. I concur with everything, and basically I have nothing else to add. So I look at the indictment, and I see enough information in the indictment itself to suggest a kickback scheme. I mean, they don't call it a kickback scheme until you get to Nishida in Count 102, but it seems to read, in other words, I think that if the jury had been properly instructed on the kickback requirement, there would clearly have been enough evidence in this case, which is kind of what Judge Ezra said, to sustain a kickback on a services conviction. You don't think so because it came from union members, but the way I see it, there was a contract with somebody else, and Rodriguez was approached by HDS looking for the business, and it was Rodriguez that came up with the idea of commissions. Am I right about that? It's not clear to me that you are right about that because I think, again, there's some murkiness. Commissions are routinely paid in these contracts. I don't mean to criticize you, but if I look at the record, I see that the record says, without any contradiction, that the idea was suggested by Rodriguez. Was it or was it not? I read the record to say that there is evidence of that fact. However, I also – There is no evidence that disputes that fact. There is no specific evidence other than – It strikes specific. Okay. There's no evidence at all. Judge Trautman, let me put it to you this way. First of all, the defense did not put on a case in this situation. There were no defense witnesses called. I understand that. That's one of the reasons I asked for the argument in the transcripts. Right. The argument that was made was that these are routine commissions that are part of these contracts, and the only discussion was to whom should those commissions be paid. That's how I overall read this record. But I agree with you that there was a discussion and there was evidence that in a meeting that occurred early on in the stages, the suggestion was made by Mr. Rodriguez that there would be a commission. That evidence is in the record. Then the other side comes back with a – was it a menu? You can either have an administrative fee or a consulting fee. That's right. And Rodriguez chose consulting fee. Right. I'll designate to whom these commissions go. That's what happened. Am I also clear that there was no work done at all in terms of commission work? In other words, it was just a pass-through of money. That's the argument, but there was evidence that Robin Sabatini did in fact do substantial work and there were significant volumes. I read the work as all she was doing was counterfeiting somebody else's work and passing it off as her own. That was the argument. Is there any evidence that disputes that? Did she say, no, this is stand-alone, valid commission work? She did not testify. So there's no evidence that this was anything other than counterfeit? Only the cross-examination of the witnesses that suggested that in fact there may have been work. Suggestions aren't evidence. The questions aren't evidence, as you know. The answer. The jury did not make findings contrary to that argument. That's correct. All right. Thank you. Thank you. Good morning. May it please the Court. I'm Larry Tong, Assistant United States Attorney. Before I throw you completely off, what happened to the Nishida count that says kickbacks in the indictment? That was count 102, Your Honor, and he was Mr. Rodriguez was convicted. That was affirmed on direct appeal. And it's not here. It's not before you. Okay. But that's the only place in the indictment that says kickback. Yes, Your Honor. Okay. Your Honor, before I get too far, I'd just like to introduce United States Attorney Florence Nakakuni, who's present. She tried this case as an Assistant United States Attorney in case any questions should arise. But, Your Honor, to follow up on Judge Trott's questions, first off, your command of the record is precise and it is correct. Mr. Rodriguez, the head of the UPW, raised the issue of the consulting fee. That appears at transcript five, pages 121 to 22, pages 597 and 98 of the supplemental excerpts of record. The HDS was all too happy to oblige. You can see the chronology of events. Essentially, HDS says, sure, we'll pay the consulting fee. And Mr. Liu, the head of HDS, offers what you've termed a menu, essentially saying here is the premium and we are building in an administrative fee and a consulting fee. Mr. Seitz, as much as he likes to argue and revisit the argument that was rejected by the jury nearly 10 years ago, wants to say that those fees were earned. That was one of the major thrusts of the defense in their closing argument. I can't find any evidence at all. Four wins didn't do anything. And then they reconstructed four wins by moving it over to, however you pronounce it, Ali'i, Inc. And that's the firm that produced, if anything, a counterfeit. It's recycled data that was taken from another entity, claimed as her own to justify what we argued were sham consulting fees, in which the jury accepted. Now, in light of the jury's verdict, I think we can draw certain conclusions in response to your dialogue with Mr. Seitz. First off, I would agree with the Court. We have argued below, we argue here, that while the indictment didn't use the magic word, there's no way to read it other than to say that it alleged and that we proved an honest services fraud scheme that involved kickbacks. The Messenger Seventh Circuit case essentially says we are not bound by the precise wording of the indictment. We need to look at the substance. That seems particularly appropriate in a case like ours where the jury was properly instructed, the indictment was proper at the time, but the Supreme Court has an intervening decision that changes the landscape. Now we're left with this construct where we have to decide what did the jury find or was it harmless. This is not a structural error. The Court can still affirm if it finds that the record establishes the jury made the requisite findings. And that's the hard part. It's not that there was enough evidence for them to have made that findings. Whether they did or whether we can't tell whether they just made an honest services conflict. This is not a sufficiency of the evidence argument. I mean, I agree that the standard that we apply, Your Honor, is the Brecht standard, substantial injurious influence on the verdict. Is there an overlay to that? Do we have to conclude beyond a reasonable doubt that there was no substantial influence? I think the district court was correct in deciding that the test was would the jury properly instructed have found beyond a reasonable doubt the elements of the offense? No, that's where you lose me. I don't think it's that at all. I think it's whether they did. The Hornsby language is the language that strikes me because we're dealing with an element of the offense. There is one difference, though, Your Honor. In Hornsby, I think the instructions permitted a generalized conviction on an undisclosed self-dealing theory. Here we have something where one of the instructions that the court gave on the honest services fraud offense was that the defendant had to either cause or know that his actions could cause economic harm to the union. One of the big issues here, so that takes us out of just the self-dealing, the vagueness, the concept that, you know, 1346 is too broad because you can criminalize someone for just acting in his own interest without a benefit or with an incidental benefit. You need a kickback. You need a bribery. You need something to show that there's real mens rea that is accepted as criminal under the statute. What we have here, Your Honor, is collective findings that I submit to you under your proposed test or mine are adequate to sustain the verdict. First off, on the mail fraud side, the jury was instructed and the jury found that the of these contracts. Secondly, that he knew or could foresee that his acts would cause economic harm. Third, that the mailings of the checks to his daughter representing consulting fees were in furtherance of the scheme, linking them inextricably. So we have one end where he's basically found guilty by the jury of concocting the scheme where his daughter gets checks mailed to her for sham consulting fees. Secondly, on the embezzlement end, remember the indictment, Your Honor, says the accusation was that the defendant, Gary Rodrigues, embezzled to himself or to the use of another money belonging to UPW in the form of and by causing UPW to pay excess premiums. The other side says it's not UPW that's involved here. The money came from the members, not the union. Is there anything there? I read the panel opinion on the direct appeal and this court concluded otherwise. That's a dead issue. I mean, I know he likes to revisit old issues, but that's a dead issue. That's not before the court. The embezzlement convictions have been affirmed. They became final. They're not part of the certificate of appealability. It is cast in stone that those are good convictions. And the Ninth Circuit looked at that evidence and essentially said the gist of the money, the sham consulting fees, to his daughter through this disguised scenario that Your Honor has made. Was this jury instructed so that they could have convicted him on an honest services conflict of interest basis? Absolutely not, Your Honor. Absolutely not? Absolutely not. They were instructed and they had to find, let me just tick them off, schemed and deprived, could foresee economic harm, mailings of the bogus checks were in abstracted money belonging to UPW for the purpose of funding the sham consulting fees and he acted with fraudulent intent. Those are all elements of embezzlement and mail fraud as it was instructed. And what you have is a jury finding that both ends of the transaction were illegal. The scheme to set it up was illegal because it was mail fraud and he deceived them with the sham consulting fees and the stealing of the money or the redirection of the money to fund the scheme was also illegal. The only thing the jury did not find is the one magic word. Was this a kickback? Now, after the Court asked Mr. Seitz to provide the panel with the closing arguments – I read it with great interest because, of course, we like to define what the judges are thinking and we were discussing it among ourselves – Mr. Weinberg, while giving an extremely spirited closing argument, never offered any plausible theory of what these payments could be other than kickbacks. He just went on a frontal attack. He said the government has failed to prove that this money was UPW's money. The government has failed to prove that he stole this money. The government has failed to prove that there were excess premiums paid to fund the payments and, by the way, at best, all the government has shown is that Gary Rodrigues was a powerful man who got his daughter a good job and then she earned the money. Take a look at all those exception reports, which Your Honor has correctly characterized as recycled data from another source. How did the sprinkler guy, Mr. Loughran or whatever his name is pronounced, get into this thing? Was he – did he – no, he was dead. Did his wife testify? He was dead. I believe either his wife or his wife or daughter testified, Your Honor. Was that part of the indictment or part of the proof? Both. Both. It's part of the indictment. It was not – there were no mailings to Loughran in furtherance of the scheme, presumably because they were outside the five-year statute of limitations. But the scheme extended beyond. The scheme showed an ongoing scheme to set up this scenario where he could direct consulting – Pay off the $10,000 sprinkler system debt. Absolutely. And he paid $14,400, then changed his – you know, he said the debt is – excuse me, the debt is paid off. Pow is Hawaiian for done. And I apologize. Welcome to Hawaii. So I've lost my own train of thought now. He said that the debt is completely satisfied now, so hold those fees. HDS then held those fees, and they just accumulated until they one day came to Mr. Rodrigues and said, hey, now what? And then he concocts this scenario where you go through his daughter receiving it through two different companies to disguise the fact that she's getting it. When it comes under scrutiny through the newspaper article, she creates the second company using her maiden name – I'm sorry, her married name and her middle name again to disguise it. And then she creates these exception reports that are recycled. How does VEBAH get into this whole thing? That had to do with the PGMA, as I recall, scheme, which was a health insurer scheme independent of HDS. And to sort of dilute it through multi-layers, they contracted with VEBAH to process the consulting fees. VEBAH then consulted or contracted with another entity, which ended up making the payments to her. It looked like a laundering scheme. It does. Our theory of trial was it was done for one purpose and one purpose alone, which was to disguise what was really happening here. And in fact, the jury found that there was a laundering scheme. They found the guilt based on the concealment money laundering consisting of the deposit of all the checks in the business names to disguise the fact that they were really going to the defendant's daughter. And by the way, he benefited personally, if that were required, because he got a truck. So we would submit, Your Honor, under whatever standard you choose. I see my time is up. I don't know if I'm going to ask a question. Roberts. I'm going to finish your thought. We would submit that under whatever standard you choose to apply, we have a disagreement on the standard. I think Your Honor knows my position. I appreciate your position. What is your position again? My position is I think Judge Ezra applied the correct standard. The basic substantial or injurious effect or influence. I would submit that as a standard. And my recollection is. . . Because a lot of the other cases start talking about Chapman and beyond a reasonable doubt, and I think it may be a combination of the two. I think it's a combination. I'm agreeing that beyond a reasonable doubt appears there. I'm just saying you look at the substantial and injurious influence or effect, but the issue is not did the jury find, because that's an impossible standard. We need it here. But in the average case, that's an impossible standard, because if they're not Well, I don't know. Hornsby seems to suggest that's where you have to go. Hornsby had a scheme that was broader than here, and you had findings that were somewhat contradictory, because he was tried on two different schemes, one which was legally valid and the other which was not, involved a bribe. And they said the bribery would stand alone, but for the fact that this scheme is not restricted, according to Skilling, there might be a spillover effect. We can't tell. Here you can tell. I mean, I've ticked off all the findings. I urged the Court to look at the jury instructions. We've cited them in our briefs. I think they've made every finding but kickback. And if you look at the closing argument, they did not say anything other than there was no fraud and she earned the money. The jury found economic harm, a fraud, an embezzlement, a theft of money to fund the sham consulting fees. That represents a finding that all the money that Robin Sabatini got was not earned and was bogus. And what could it be other than a kickback? He's giving HDS the business. The language of the contract says HDS then agrees to take 1 percent of the employer's contributions and pay it back. I mean, I've got half of the kickback there with the payback. As far as I can tell, there's no doubt that the premiums were higher because of this than they would have been otherwise. He's going to disagree. That was their theory at trial that that was not so, but there is evidence in the record that says, yes, it was higher because it's built into the administrative fee. A theory like mist on eyeglasses, obscure vision. Well, Your Honor, I predict that when you clean your eyeglasses, it will become crystal clear that the evidence was sufficient to justify Judge Ezra's finding here and we ask that it be affirmed. Thank you. Mr. Seitz, I'll give you two minutes. I don't even think I need all that long, but thank you. That's fine. I just want to respond to a couple of factual things. First of all, VEBA, the Voluntary Employees Benefit Association, was not set up for anything having to do with this particular case. It's an ongoing organization that administers insurance funds for unions and other organizations. They didn't hang on to the money either. No, they didn't, but I want to say it's not as if they were part of a conspiracy which involved this particular case. Secondly, there is an issue here, if properly instructed, whether the jury would have found that the payments to Robin Sabatini, Mr. Roderick's daughter, constituted kickbacks to him. Now, again, you can make the argument that maybe they would have because it's a benefit to him to pay his daughter, but kickbacks are a specific term, and in this instance, there's no evidence that the benefits in those counts went to Mr. Roderick. You will agree, though, that it doesn't have to go to him. If he concocts something directed to somebody else, that could amount to a kickback. It could. What about law firm? That went to satisfy the debt that he owed. Yes, but that's not part of this process here. Those are separate counts, and, again, I think that we need to distinguish that. Lastly, again, I want to go back to the language which we talked about earlier at the beginning of this case, which is the language that appears in the Hornsby case, and I think the language that appears in that opinion where it says basically that while a reasonable jury could infer from this evidence that Hornby's scheme to defraud was all along a scheme to receive a kickback, we cannot say, quote, with fair assurance that the jury convicted Hornsby on this basis alone. And that, I think, is the question we have to answer in this case. Exactly. Can we say that? Do you have anything you want to say about the arguments before we go? I haven't read them yet. That's why I asked for them. I've read them through, and, no, I don't have anything additional to add. Thank you. Thank you very much. Thank you for your argument here this morning. We will take the matter under advisement. Please consider the cases submitted at this point. Thank you.
judges: Goodwin, Trott, Murguia